**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 16, 2026**

# In the Court of Appeals of Georgia

A25A2035. KINGWOOD INTERNATIONAL RESORT, LLC et al. v. MCMURRY et al.

DOYLE, Presiding Judge.

Various homeowners in The Overlook at Kingwood subdivision ("The Overlook") filed the instant suit,[1] alleging claims of fraud and violations of the Georgia Racketeer Influenced Corrupt Organizations Act ("RICO Act"), among other things, against Kingwood International Resort, LLC ("KIR"), Farbod Zohouri, Richard Nasser, Joshton Zohouri, Peng Wang, (collectively "the Defendants") and The Overlook at Kingwood Property Owners Association, Inc. ("The Association").[2] The

---

[1] Two sets of homeowners filed separate suits that were consolidated by the trial court.

[2] This opinion refers to Farbod as "Zohouri" and Joshton by his first name.

Defendants appeal, challenging the verdicts and the punitive damages award. For the reasons that follow, we affirm the verdicts as to fraud and violation of the RICO Act, but we vacate the punitive damages award and remand the case for further proceedings.

Viewed in the light most favorable to the verdict, see *Paine v. Nations*, 283 Ga. App. 167, 167–68 (641 SE2d 180) (2006), the record shows that in 2006, Kingwood, LLC ("Kingwood"), executed the Declaration of Covenants, Conditions, and Restrictions for The Overlook ("2006 Declaration"), which was recorded in Rabun County along with a plat of the subdivision ("the Plat"). The 2006 Declaration named Kingwood the declarant, and both the Plat and the 2006 Declaration were referenced in the homeowners' deeds. The 2006 Declaration referenced The Association as the nonprofit homeowner's association for the Outlook as well as various covenants and procedures governing the subdivision.

In 2010, Kingwood lost its ownership interest in The Overlook (essentially the remaining unsold lots and common areas) after United Community Bank ("UCB") foreclosed. Great Oak Owner, LLC, ("Great Oak") purchased UCB's interest, and in 2015, KIR purchased Great Oak's interest. Meanwhile, the Georgia Secretary of

State administratively dissolved The Association on August 26, 2011. None of the homeowners acted under the Georgia Property Owners Association Act ("POA Act") to create a new association after the dissolution, but several took initiative to care for the common areas using their own time and money.

On May 15, 2015, when KIR acquired Great Oak's interest in The Overlook, including multiple undeveloped lots, Kingwood executed "the First Amendment" to the Declaration, which purported to assign Kingwood's declarant rights to KIR. After the First Amendment was filed, KIR executed "the Second Amendment" on May 30, 2015, raising the yearly assessments and declaring that ownership of two adjacent lots counted as a single ownership interest. On April 16, 2018, KIR executed the "Third Amendment," declaring that all current and future lot owners were required to join as members of Kingwood Country Club. Finally, on January 30, 2020, KIR executed "the Fourth Amendment," abolishing the previous 1,200-square-foot building minimum, and KIR began construction on 2 homes under that minimum.

In March 2020, after construction began on the smaller homes, the homeowners notified the Defendants and The Association that the homeowners believed that KIR was violating the Declaration and Plat by constructing the smaller

homes; that the homeowners had been charged unauthorized fees, penalties, and assessments; and that the Defendants had threatened to take the homeowners to court, had reported them to debt collectors, and had made negative reports to credit bureaus.

In April 2020, the homeowners filed suit seeking injunctive relief and alleging claims of conversion, breach of contract, fraud, RICO Act violations, and Fair Credit Reporting Act violations, among other things. Initially, the suit focused on obtaining an injunction to prevent KIR from constructing homes smaller than the 2006 Declaration's 1,200-square-foot requirement.

After a hearing on May 12, 2020, the trial court issued a temporary restraining order ("TRO") against the Defendants, ordering them to cease construction on the smaller homes. Another hearing occurred later that summer revisiting the TRO and addressing the homeowners' motion for contempt, at which time evidence was submitted as to the legality of the First Amendment to the Declaration. KIR argued that the First Amendment gave it declarant rights and allowed it to unilaterally issue the Second, Third, and Fourth Amendments, including elimination of the square-footage minimum, among other things. The homeowners argued that KIR was not the

true declarant, rendering void the subsequent Amendments to the 2006 Declaration, and they argued that KIR had no authority to make assessments, demand money, or construct houses in violation of the 2006 Declaration.

In July 2020, the trial court entered an omnibus order addressing the homeowners' requests for an extension of the TRO, their contempt motion, and the Defendants' motion to dismiss. The trial court denied the motion to dismiss, determining that KIR was not the declarant because (1) declarant's rights were not explicitly included as collateral in the chain of title documents transferring ownership from Kingwood to UCB, to Great Oak, and then to KIR; and (2) Kingwood had no declarant rights to transfer to KIR via the 2015 First Amendment.[3] The court relied on the language of the 2006 Declaration, *Armstong v. Roberts*, 254 Ga. 15 (325 SE2d 769) (1985), and *Chisholm v. Danforth, LLC*, 352 Ga. App. 682 (835 SE2d 666) (2019), in making the determination. The trial court concluded that the Second, Third, and Fourth Amendments to the 2006 Declaration were void as a result.

---

[3] KIR requested a certificate of immediate review from this order, which the trial court granted, and thereafter, this Court granted its interlocutory appeal application. See *Kingwood Int'l Resort, LLC v. Bachewicz*, Case No. A21I0013 (Ga. App., Aug. 12, 2020). KIR failed to transmit the record and withdrew its appeal in May 2022.

Thereafter, discovery ensued as to the other claims alleged by the homeowners, but agents of KIR purported to hold a vote in order to elect a Board for The Association, later moving to lift the injunction on the basis that it was empowered to enact changes to the 2006 Declaration. After a hearing, the trial court denied the motion to lift the injunction, declared the vote void, and issued an order with instructions for The Association to conduct a new vote. The homeowners also moved for sanctions based on the Defendants' failure to allow them to view The Association's financials.

In June 2021, KIR filed a second motion to amend the injunction, seeking approval of the latest Board election and seeking dismissal of the amended complaint. The trial court again declined to approve the vote, finding that KIR had acted improperly during the vote and ordering a third election. The court also granted the homeowners' motion for sanctions.

The Association moved for the court to approve the third election of the Board, and KIR then moved to modify the injunction as to its uncompleted homes. The homeowners again moved for contempt, claiming that KIR had started constructing other homes in violation of the injunction and had failed to pay the earlier sanctions

award. The court denied KIR's motion as to the injunction based on its failure to obtain a variance from the county. The court initially declined to approve the third election, approving it on reconsideration. The court granted the homeowners' contempt motion and ordered KIR to immediately halt construction.

After the parties filed cross-motions for summary judgment, the trial court granted in part and denied in part the motions. Specifically, the court dismissed all the claims against The Association on the basis that the homeowners were required to bring any action against it as a derivative action, but because of its prior determination that KIR was never the declarant, the court allowed claims against the Defendants for any acts occurring between 2015 and 2021, when the third election occurred. The Court also reiterated its finding that KIR obtained no declarant's rights when it purchased its interest in the lots and common areas in 2015. The remaining claims for fraud and RICO Act violations against the Defendants proceeded to trial, and the jury returned verdicts in favor of the homeowners and awarding each of the 11 households specific amounts of damages based on the evidence from trial. These amounts initially were $2,700; $10,000; $9,695; $2,369; $1,690.40; $4,163; $1,750; $600; $4,700; $4,200; and $8,586, which the trial court trebled based on the jury's determination

that the Defendants had violated the RICO Act. Thus, the awards became $8,100; $30,000; $29,085; $7,080; $5,072.10; $12,489; $5,250; $1,800; $14,100; $25,758; and $12,600. The jury also found that punitive damages were due, and that portion of trial commenced.

After being instructed on the issue of punitive damages, the jury found that the Defendants' fraudulent acts were specifically intended to do harm to the homeowners. Based on the evidence from trial and additional evidence presented during the punitive-damages phase, the jury awarded $1,931,818.18 to each household in punitive damages. This appeal follows.

1. The Defendants argue that the fraud and RICO Act violation verdicts should be reversed for several reasons.[4]

(a) First, the Defendants contend that the trial court erred by determining as a matter of law that the First Amendment did not assign declarant rights to KIR from Kingwood. They contend this affects the verdicts because if KIR became the declarant in 2015, then all the acts it took were valid, and no fraud occurred.

---

[4] For clarity, we do not address the Defendants' enumerations in order.

In the initial stages of this case in 2020, the trial court determined that KIR was not the declarant, and the purported First Amendment was void because Kingwood was divested of any interest in the declarant rights when it was divested of an ownership interest of The Overlook, citing *Armstrong*, 254 Ga. at 16, which states: "A developer of a subdivision who reserved [certain] authority ... in covenants running with the land no longer possesses that authority after divesting himself of his interest in the subdivision." See also *Chisholm*, 352 Ga. App. at 687-89(1); *Rice v. Lost Mountain Homeowners Ass'n, Inc.*, 269 Ga. App. 351, 352 (604 SE2d 215) (2004) (quoting *Armstrong*, 254 Ga. at 16)). The trial court found that Kingwood lost its interest when the Bank foreclosed on it, was therefore no longer the declarant, and had no interest to pass to KIR. See *Armstrong*, 254 Ga. at 16. KIR renewed its challenge to the trial court's determination in its motion for summary judgment, at which point it argued that the POA Act applied, but the trial court found that the POA Act did not afford relief from the holding of *Armstrong*.

"[T]he declaration of a homeowner's association is considered a contract, and we therefore apply the normal rules of contract construction to determine the meaning of the terms therein." *Amberfield Homeowners Ass'n, Inc. v. Young*, 346 Ga. App. 29,

9

31 (813 SE2d 618) (2018). The Defendants claim that the trial court should have applied the POA Act to find that KIR became the declarant in 2015. See OCGA § 44-3-221(5) (defining "Declarant" under the POA Act as "[a]ny successors-in-title of any owner or lessee referred to in this paragraph who comes to stand in the same relation to the property owners' development as his or her predecessor did shall also come within such definition."). The Defendants contend that *Armstrong* should not apply because it predates the POA Act and because KIR otherwise meets the statutory definition of a declarant. Nevertheless, we do not read the POA Act to conflict with *Armstrong* such that the 2006 Declaration language resulted in Kingwood retaining the status of declarant after losing title to the underlying property. Moreover,

> [t]he decisions of the Supreme Court shall bind all other courts as precedents. As an intermediate appellate court, we are bound by Georgia statutes and Supreme Court of Georgia decisions. When the Supreme Court has addressed an issue in clear terms, this Court is not at liberty to decline to follow the established rule of law. It is axiomatic that this Court is bound by the precedent of the Supreme Court.

*Beasley v. Dep't of Corr.*, 360 Ga. App. 33, 42–43(3)(b) n.38 (861 SE2d 106) (2021) (citations and punctuation omitted). Accordingly, as we see no basis to depart from the rule in *Armstrong*, this enumeration is without merit.

10

(b) The Defendants contend that "fraud cannot be presumed," and there was no evidence of scienter.[5] We disagree.

"To recover for actual fraud, five elements must be shown: 'a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff.'" *Thakkar v. Parikh*, 375 Ga. App. 621, 623(1) (917 SE2d 193) (2025). The Defendants contend that the jury simply presumed scienter regarding their acts during 2015 to 2021.

> Proof of fraud is seldom if ever susceptible of direct proof, thus recourse to circumstantial evidence usually is required. Moreover, it is peculiarly the province of the jury to pass on these circumstances showing fraud. Except in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination.

*Remax N. Atlanta v. Clark*, 244 Ga. App. 890, 894–95 (537 SE2d 138) (2000) (punctuation omitted).

---

[5] The Defendants have not enumerated error as to the RICO Act violations, but we note that "the commission of fraudulent acts against multiple consumers[, which occurred here, satisfies] the 'predicate acts' requirement [for a RICO Act violation]." *Spier v. Krieger*, 235 Ga. App. 392, 401(5)(a) (509 SE2d 684) (1998) (physical precedent only).

Here, there was ample evidence presented to the jury from which it could find that the Defendants knew that they were not authorized to act as The Association, but they did so anyway and avoided following any legal requirements until forced to do so through the legal process, and only after the trial court voided multiple attempts to circumvent appropriate procedure. There was evidence that they not only improperly billed homeowners, including those not parties to the litigation, but they also sent the homeowners into collection or reported them to credit agencies. The Defendants repeatedly attempted to evade any rules related to electing a Board and removed large amounts of money from The Association without explanation or evidence of subdivision improvement. The Defendants threatened the homeowners, filing a retaliatory lawsuit against one homeowner and the homeowners' attorney involved in this litigation, and they were held in contempt multiple times during the litigation for ignoring court orders. Evidence presented to the jury also showed that the Defendants repeated this same tactic with other developments, but were stopped by court order. See *Kothari v. Patel*, 262 Ga. App. 168, 170(A)(1) (585 SE2d 97) (2003) ("In civil cases involving allegations of fraud, other transactions may be admissible to show motive or intent."). Taken as a whole, the evidence meets the any evidence standard,

and the Defendants have not established that the verdict should be overturned. See *Thakkar*, 375 Ga. App. at 623(1).

(c) The Defendants also contend that the claims were not actionable because asserting authority to take the actions they did between 2015 to 2021 was a potential misrepresentation of law, not fraud. The Defendants cite *Lakeside Inv. Group, Inc. v. Allen*, 253 Ga. App. 448 (559 SE2d 491) (2002), for the proposition that "[a] misrepresentation as to a matter of law 'is a statement of opinion only and can not afford a basis for a charge of fraud or deceit,'" but that statement clarifies that it is in the context of two people making a contract. Id. at 450(1). In this case, however, the jury heard the Defendants' arguments that they believed they had the right to charge the homeowners for this money, and the jury did not credit it. Moreover, although the Defendants contend that the homeowners were obligated to pay dues during this time (even in the absence of an association), they cite no law to support this contention.

(d) Finally, the Defendants contend that the trial court abused its discretion by excluding evidence of their state of mind by precluding their attorney from testifying about his legal opinion and/or by prohibiting them from testifying about the effect of his opinion on their understanding.

"The admissibility of evidence lies in the trial court's discretion, and the appellate court reviews evidentiary rulings under the abuse of discretion standard." *Toler v. Ga. Dep't of Transp.*, 328 Ga. App. 144, 145 (761 SE2d 550) (2014) (citations and punctuation omitted). The Defendants have not established that the trial court abused its discretion by prohibiting testimony about the attorney's legal opinion regarding whether or not KIR became the declarant in 2015 because multiple Defendants and other witnesses testified that they believed that KIR had the status of declarant, which was why the Defendants took the actions toward the homeowners that they did. *HA&W Fin. Advisors, LLC v. Johnson*, 336 Ga. App. 647, 654(2) (782 SE2d 855) (2016) (explaining that any error in excluding evidence was harmless because the evidence was cumulative of other properly admitted evidence). It was for the jury to accept or disregard this evidence in determining whether there was evidence of fraud or violations of the RICO Act. Compare *Rhone v. Bolden*, 270 Ga. App. 712, 722–23(10) (608 SE2d 22) (2004) (holding that it was appropriate for attorneys to testify in a legal malpractice suit). Accordingly, the Defendants have not established that the trial court abused its discretion in prohibiting this testimony.

2. The Defendants also argue that trial court should have dismissed the homeowners' claims because they should have been brought pursuant to a derivative suit. We disagree.

> A derivative suit is brought on behalf of a corporation for harm done to it, and any damages recovered are paid to the corporation. And although plaintiffs may bring direct actions for injuries done to them in their individual capacities by corporate fiduciaries, our Supreme Court has held that to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation. In fact, to set out an individual action, the plaintiff must allege either an injury which is separate and distinct from that suffered by other members, or a wrong involving a contractual right of a member which exists independently of any right of the corporation. Thus, for a plaintiff to have standing to bring an individual action, he must be injured directly or independently of the corporation. Furthermore, the determination of whether a claim is derivative or direct is made by looking to what the pleader alleged, and it is the nature of the wrong alleged and not the pleader's designation or stated intention that controls the court's decision.

*Crittenton v. Southland Owners Ass'n, Inc.*, 312 Ga. App. 521, 524(2) (718 SE2d 839) (2011) (footnotes and punctuation omitted).

Prior to trial, the trial court addressed the issue of derivative claims, dismissing several of the homeowners' claims or portions of those claims when addressing the Defendants' motion for summary judgment. The trial court determined, however, that the homeowners had stated valid direct claims for fraud and RICO Act violations against the Defendants for the period of time between 2015 and 2021. As explained in Division 1(a), KIR did not have the legal status of declarant, and therefore, the Defendants were not acting on behalf of The Association. This is not a situation in which members of a homeowners association are challenging decisions or actions taken by an association (as stated above, any such claims were dismissed by the trial court prior to trial); instead, the claims center on damages caused by KIR and the other Defendants for their own benefit when there is no evidence that any payments were due to The Association. Compare *Murray v. Lexington Park of Fulton County Cmty. Ass'n, Inc.*, 372 Ga. App. 269, 272–73(2)(a) (904 SE2d 119) (2024) (collecting cases regarding derivative claims); *N. Walhalla Props., LLC v. Kennestone Gates Condo. Ass'n, Inc.*, 358 Ga. App. 272, 275(1) (855 SE2d 35) (2021) ("Georgia decisions addressing this issue have concluded that claims related to election procedures, breach of fiduciary duties, negligent misuse of corporate funds, usurpation of corporate

16

opportunities, personal use of assets without sufficient compensation, mismanagement, and corporate waste are not separate and distinct causes of action creating a right of direct action in an individual member."). Accordingly, it was not error for the trial court to allow the homeowners to bring these particular claims of fraud and RICO Act violations as a direct action, and it was for the jury to determine whether the Defendants acted with the requisite intent to support a guilty verdict as to the claims for fraud and violation of the RICO Act.

3. Finally, the Defendants challenge the punitive damages awards. Punitive damages are authorized in tort actions "in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1(b).

(a) The Defendants argue that the trial court erred by instructing the jury during the punitive damages phase: "You may presume a person of sound mind and discretion intends the natural and probable consequences of his act. The evidence may or may not rebut this presumption." The Defendants failed to object to this instruction; therefore, we only "consider and review erroneous charges where there

17

has been a substantial error in the charge which was harmful as a matter of law."

OCGA § 5-5-24(c). Additionally, we must view it in context of the instructions as a whole. See, e.g., *Ga. Dep't of Corr. v. Couch*, 312 Ga. App. 544, 552(4) (718 SE2d 875) (2011).

> The court gave the following instruction:

> Intent is ordinarily ascertained from acts and conduct. You may not presume the defendants acted with specific intent to harm, but intent may be shown in many ways provided you, the jury, find that it existed from the evidence produced. The jury may find such intent or the absence of it upon consideration of the words, conduct, demeanor, motive, and all the other circumstances connected with the alleged act. You may presume a person of sound mind and discretion intends the natural and probable consequences of his act. The evidence may or may not rebut this presumption. The plaintiffs must prove by a preponderance of the evidence that the defendants acted with specific intent to harm.

(Emphasis added.)

Viewed in context, there was not substantial error in the charge because the trial court explicitly instructed the jury that it was required to find specific intent to do harm and could not presume that the Defendants acted with specific intent to harm. Compare *Wal-Mart Stores v. Johnson*, 249 Ga. App. 84, 89(6) (547 SE2d 320) (2001)

(explaining that "[a] finding of specific intent to cause harm may not be based on the rebuttable presumption that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts") (overruled on other grounds by *Ferrell v. Mikula*, 295 Ga. App. 326, 333(2) (672 SE2d 7) (2008)). Accordingly, this argument is without merit.

(b) The Defendants also argue that the award was unconstitutional because it violates due process or is excessive.

When punitive damages are to be awarded, the trier of fact is to assess "evidence regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case." OCGA § 51-12-5.1(d)(2). Indeed, "punitive damages may be awarded even when actual damages are small." *Tyler v. Lincoln*, 272 Ga. 118, 121(1) (527 SE2d 180) (2000). Thus, "[t]he proper amount of punitive damages is based on the enlightened conscience of the trier of fact, and on appeal, an award will not be disturbed unless it is so excessive or inadequate as to shock the judicial conscience to the degree that a judgment entered thereon constitutes an error of law." *Cotto Law Group, LLC v. Benevidez*, 362 Ga. App. 850, 858(2) (870 SE2d 472) (2022) (citation modified). See

also *Thakkar*, 375 Ga. App. at 630(3)(d) (vacating $65,000,000 punitive damages award after addressing whether the award was grossly excessive in violation of "the Due Process Clause of the Fourteenth Amendment of the United States Constitution [or] Georgia law"); *Time Warner Ent. Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 599(2)(a)(i) (563 SE2d 178) (2002) (addressing the proper standard of review of a challenge to a punitive damage award). "In a case in which ... the defendant acted or failed to act with the specific intent to cause harm, the legislature has set no limit on the amount of punitive damages." *Reid v. Morris*, 309 Ga. 230, 235 (845 SE2d 590) (2020). See OCGA § 51-12-5.1(f).

In *Thakkar*, this Court explained that

> [w]hen considering a jury's punitive damages award for gross excessiveness under the Due Process Clause, an appellate court must conduct a de novo review and consider three guideposts on appeal: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

375 Ga. App. at 630–31(3)(d) (punctuation omitted).

(i) The Defendants contend that there was insufficient evidence of reprehensibility because the homeowners suffered only economic harm, there was no evidence of economic vulnerability, and there is only speculation that the Defendants have repeated these acts elsewhere.

Under *Thakkar*, to determine the level of reprehensibility, we consider whether

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Thakkar*, 375 Ga. App. at 631(3)(d)(i) (quoting *State Farm Mutual Auto.Ins. Co. v. Campbell*, 538 US 408, 419(III)(A) (2003)).

As explained in Division(1)(b), supra, there was extensive evidence that the Defendants, despite arguing that they were under the mistaken belief that they were allowed to take action as they did, engaged in obfuscation and concealment of their actions; engaged in related behavior in other instances; threatened the homeowners and employed extreme tactics to collect money; and flouted the court's orders during the legal proceeding below. Moreover, as compared to *Thakkar*, 375 Ga. App. at

21

631(3)(d)(i), this was not an isolated business transaction between two people, the fraud involved 11 households in the instant litigation and up to 13 or more households who were not involved in this litigation, not including individuals in other cases.

(ii) That said, we believe that the award must be vacated and the case remanded because the ratio of the amount awarded for compensation and punitive damages, even given the Defendants' wealth and repeated instances of bad behavior, is excessive. Considering the individual trebled awards pursuant to the RICO Act and subtracting the $250,000 cap that applies to cases with no finding of specific intent, which we have here, the ratios in this case were still very high: 1:207; 1:56; 1:57; 1:237; 1:331; 1:135; 1:320; 1:567; 1:119; 1:65; 1:133. "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Thakkar*, 375 Ga. App. at 632(3)(d)(ii) (quoting *Campbell*, 538 US at 425(III)(B)). See also *BMW of N. Am., Inc. v. Gore*, 517 US 559 (1996) (after considering and applying various factors, holding the award of $2 million punitive damages for a fraudulent misrepresentation claim was grossly excessive for the compensatory damages award of $4,000 and transcended permissible constitutional limits).

Accordingly, we conclude that, under the peculiar circumstances of this matter, the punitive damages award violates the Due Process Clause of the Fourteenth Amendment. As such, we vacate the punitive damages award and remand this case to the trial court for further proceedings in light of this opinion.

*Judgment affirmed in part, vacated in part, and case remanded. Markle and Padgett, JJ., concur.*